UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LARRY SMITH,

                    Petitioner,

    v.

JAMES COX, *et al.*,

                    Respondents.

Case No. 3:15-cv-00034-MMD-CLB

ORDER

## I. SUMMARY

Petitioner Larry Smith filed a petition for writ of habeas corpus ("Petition") (ECF No. 5) under 28 U.S.C. § 2254.[1] This matter is before the Court for adjudication on the merits. For the reasons discussed below, the Court denies the Petition, denies a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

## II. BACKGROUND

Petitioner's convictions are the result of events that occurred in Washoe County, Nevada between July 1, 2006, and July 31, 2006. (ECF No. 13-5.) The victim, T.H., who was eight years old at the time of the trial, testified that Petitioner, who was her step grandfather, "put his hands in [her] pants" underneath her underwear while they were sitting on the couch watching a movie. (ECF No. 13-17 at 21, 23–24, 30.) On April 10, 2007, a jury found Petitioner guilty of lewdness with a child under the age of fourteen years. (ECF No. 13-19.) Petitioner was sentenced to life with the possibility of parole with parole eligibility beginning after a minimum of ten years. (ECF No. 14-1.) Petitioner was also sentenced to lifetime supervision, commencing "after any period of release on parole."

---

[1]Respondents have filed an answer. (ECF No. 55.)

(*Id.*) Petitioner appealed his judgment of conviction, and the Nevada Supreme Court affirmed on May 13, 2008. (ECF No. 15-1.) Remittitur issued on May 6, 2008. (ECF No. 15-6.)

Petitioner filed a state habeas corpus petition on June 30, 2008, in Pershing County, Nevada. (ECF No. 15-8.) Petitioner's petition was transferred to Washoe County, Nevada. (ECF No. 15-9.) Thereafter, Petitioner withdrew his petition. (ECF No. 15-10.) Petitioner filed a new state habeas corpus petition and a counseled, supplemental petition on December 26, 2008, and October 5, 2009, respectively. (ECF Nos. 15-11, 15-15.) Following an evidentiary hearing, the state district court denied the petition on July 11, 2012. (ECF No. 16-14.) Petitioner appealed, and the Nevada Supreme Court affirmed on January 16, 2014. (ECF No. 17-6.) Remittitur issued on February 10, 2014. (ECF No. 17-7.)

Petitioner dispatched his federal habeas corpus petition on or about January 10, 2015. (ECF No. 5.) Respondents moved to dismiss the Petition on July 21, 2015. (ECF No. 13.) This Court granted the motion in part. (ECF No. 22.) Specifically, this Court dismissed Grounds 1(c), 6, and 7; found Grounds 1(d), 1(e), 3, and 10 were unexhausted; and ordered Petitioner to inform this Court how he wished to proceed on the unexhausted grounds. (*Id.* at 8–9.)

In response to this Court's order, Petitioner moved for a stay and abeyance, explaining that he wished to return to the state district court to exhaust his unexhausted claims. (ECF No. 34.) This Court denied Petitioner's motion, ordering him to either inform the Court that he wished to abandon the unexhausted grounds or that he wished to dismiss his Petition without prejudice in order to return to the state district court to exhaust his unexhausted claims. (ECF No. 40 at 4.) Petitioner moved for reconsideration. (ECF No. 41.) This Court denied the motion. (ECF No. 45.) Petitioner then filed an "election not to abandon any constitutional claims." (ECF No. 49.) Petitioner later moved to abandon Grounds 1(d), 1(e), 3, and 10. (ECF No. 51.) Respondents answered the remaining grounds in Petitioner's Petition on August 10, 2018. (ECF No. 55.) Petitioner then moved

"to recall all abandoned . . . claims." (ECF No. 58.) This Court denied the motion. (ECF No. 62.) It appears that Petitioner was granted parole in September 2019.

In his remaining grounds for relief, Petitioner asserts the following violations of his federal constitutional rights:

> 1a. His trial counsel failed to investigate his wife's motives.
> 1b. His trial counsel failed to actively communicate with him regarding a defense.
> 1f. His appellate counsel failed to raise a claim of double jeopardy.
> 2. There was insufficient evidence to support his conviction.
> 4. The reasonable doubt jury instruction was improper.
> 5. The State committed prosecutorial misconduct during its closing argument by diluting the reasonable doubt standard.
> 8. His sentence violates double jeopardy.
> 9. Nev. Rev. Stat. § 176.0931 is unconstitutional.

(ECF No. 5.)

## III.   LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the

meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

The Petition asserts eight remaining grounds for relief. (ECF No. 5 at 8–33.) The Court will address each ground in turn.

### A.    Ground 1(a)

In Ground 1(a), Petitioner alleges that his federal constitutional rights were violated when his trial counsel failed to investigate the potential motive of his wife, Martha Smith, in accusing him of committing a crime. (ECF No. 5 at 3.) Petitioner appears to allege that Martha may have fabricated her story for financial gain, due to their marital problems or due to their sexual incompatibility. (*Id.* at 3–4.) Respondents argue that because Petitioner admitted to touching the victim, the only issue at trial was his intent in doing so, and Martha's testimony did not address that issue. (ECF No. 55 at 5–6.) Therefore,

4

Respondents contend that Petitioner's trial counsel had no basis to investigate a fabrication motive. (*Id.* at 6.)

In Petitioner's state habeas appeal, the Nevada Supreme Court held:

Appellant argues that trial counsel was ineffective for failing to investigate whether appellant's wife had a motive to fabricate her testimony. He contends that his wife, who was a key witness for the State, had a motive to lie because she and appellant argued over finances, she was angry with him, she wanted him to give her control over the banking accounts, and she filed for divorce. Appellant failed to demonstrate deficiency or prejudice. At the evidentiary hearing, trial counsel testified that he had reviewed the wife's interview with the police and had his investigator meet with the wife in person. Trial counsel denied that appellant told him that he and his wife were fighting over finances or that the wife had attempted to coerce appellant into signing over a power of attorney to her. Appellant admitted that he did not inform counsel of these matters. Therefore, appellant failed to demonstrate that trial counsel's performance was deficient. Furthermore, appellant failed to demonstrate prejudice, given that he admitted to the police that he touched the victim's genitals and the victim testified at trial about the touching. Thus, we conclude that the district court did not err in denying this claim.

(ECF No. 17-6 at 3.) The Nevada Supreme Court's rejection of Petitioner's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result

5

is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

Petitioner's trial counsel testified at the post-conviction evidentiary hearing that he reviewed Martha's police interview and had his investigator speak with Martha before the trial. (ECF No. 66-1 at 17, 20, 30.) In her police interview, Martha explained that she and Smith lacked "a sexual drive," that she and Smith had not had "sex in a few years," and that Smith watched "x-rated shows." (*Id.* at 23.) Petitioner's trial counsel testified that Petitioner never told him "why he thought Martha Smith might lie or exaggerate," did not discuss "financial problems the couple was having," did not talk about the fact that "Martha Smith wanted control over the finances," and never told him that "Martha Smith had a gambling problem." (*Id.* at 22.) Petitioner did tell his trial counsel that Martha requested that he sign a power of attorney, but Petitioner told his trial counsel this was due to her

6

needing money, not due to the fact that Martha wanted control over the couple's finances. (*Id.* at 24–25.) Petitioner's trial counsel also testified that he did not remember whether he was "aware that Mr. Smith was getting sued for divorce by Martha Smith prior to the jury trial." (*Id.* at 31.)

Petitioner testified at the post-conviction evidentiary hearing that he did not tell his trial counsel that Martha wanted control of their finances or that he and Martha were having financial issues because he "was [n]ever asked that question." (ECF No. 66-1 at 39, 46.) Petitioner also testified that never told his trial counsel that he was on medication that affected his "sex drive" because he "[n]ever had the chance to." (*Id.* at 49.)

The Nevada Supreme Court reasonably concluded that Petitioner failed to demonstrate that his trial counsel was deficient regarding his investigation into Martha. Indeed, Petitioner's trial counsel reviewed Martha's police interview and had his investigator speak with Martha before the trial. (ECF No. 66-1 at 20, 30.) As far as investigating Martha's alleged fabrication motives, Petitioner's trial counsel testified that Petitioner never indicated why Martha may fabricate her testimony and never told him about the parties' financial issues. (*Id.* at 22.) Although Petitioner may have not been asked about these issues by his trial counsel, Petitioner testified that he never volunteered the information. (*Id.* at 46.) While the "failure to cross-examine [a] witness[] about their motivation for testifying as they did . . . [is] unreasonable,'" *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir. 2006) (citing *Strickland*, 466 U.S. at 689), it cannot be concluded that Petitioner's trial counsel was deficient because Petitioner failed to alert this trial counsel to these potential impeachable issues. *Strickland*, 466 U.S. at 688.

The Nevada Supreme Court also reasonably concluded that Petitioner failed to demonstrate prejudice. As will be discussed further in Ground Two, Martha's testimony at the trial was limited to the fact that she felt uncomfortable with Petitioner taking the victim camping alone, that Petitioner did not do a lot of activities with his other grandchildren, and that the victim confided in her about being inappropriately touched by Petitioner. (ECF No. 13-7 at 48–49, 51–53.) Because Martha's testimony was not especially incriminating, it

cannot be concluded that the impeachment value of the couple's financial issues, the fact that Martha had filed for divorce, and Martha's statement to the police that Petitioner lacked a "sex drive" was compelling.[2] This is especially true given that the victim testified that the Petitioner touched her inappropriately, and Petitioner admitted that he touched the victim, albeit that his motivation for doing so was disciplinary in nature. (*Id.* at 30–31, 97.) Therefore, Petitioner cannot demonstrate that the result of his trial would have been different had his trial counsel investigated Martha further and impeached her with this information. *Strickland*, 466 U.S. at 694; *see also Sully v. Ayers*, 725 F.3d 1057, 1073 (9th Cir. 2013) (finding that "the supposedly impeaching evidence that counsel failed to uncover and present . . . either had no impeachment value or was inculpatory"); *Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that any "failures regarding impeachment of [the witness] are of comparatively little consequence").

The Court denies Petitioner relief with respect to Ground 1(a).

## B. Ground 1(b)

In Ground 1(b), Petitioner alleges that his federal constitutional rights were violated when his trial counsel failed to communicate with him regarding his defense. (ECF No. 5 at 3.) Respondents contend that Petitioner fails to identify alternative strategies, potential witnesses, or further evidence he would have brought to his trial counsel's attention had there been further communication. (ECF No. 55 at 7.)

In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> Appellant failed to demonstrate deficiency or prejudice. Trial counsel testified that he met with appellant several times in jail, spoke with him by phone numerous times, and also met with him in court. Appellant failed to explain how further communication would have helped with his defense or changed the outcome of the trial. *See Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004); *Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).

---

[2]Petitioner's trial counsel also testified at the post-conviction evidentiary hearing that he did not ask Martha about her statement to the police that Petitioner did not have a "sex drive" because "as soon as [he were to] bring that up, it's coming in that [Petitioner] watches pornography, which . . . would be more prejudicial." (ECF No. 66-1 at 24.)

(ECF No. 17-6 at 3–4.) The Nevada Supreme Court's rejection of Petitioner's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

On January 18, 2006, Petitioner sent a letter to the state district court indicating that he had "made every effort to communicate with [this trial counsel] but to no avail." (ECF No. 13-7 at 4.) Petitioner explained that he had "probably only talked to [his trial counsel] for a few minutes" and that "[i]t seem[ed] that all [his trial counsel was] concerned about [was Petitioner] taking a deal." (*Id.* at 4–5) At Petitioner's entry of plea hearing on February 9, 2007, Petitioner requested that the state district court grant him substitute counsel. (ECF No. 13-9 at 4.) In response, Petitioner's trial counsel stated, "My supervisor talked to [Petitioner] extensively on the phone about this case. I've talked to him extensively on the phone about this case. Nobody is ignoring him." (*Id.* at 5.) The state district court informed Petitioner that he was required to file a motion "[i]f [he] want[s] another lawyer." (*Id.* at 7.) The following month, on March 22, 2007, Petitioner moved to dismiss his counsel and for the state district court to "appoint new counsel." (ECF No. 13-12.) At the motion to confirm trial hearing held on March 28, 2007, Petitioner confirmed that it was still his desire to "sever [his] relationship with [his trial counsel]." (ECF No. 13-13 at 4.) The state district court denied the motion, explaining that "there's [not] enough information in [Petitioner's] motion." (*Id.* at 5.)

At the post-conviction evidentiary hearing, Petitioner's trial counsel testified that he "visited [Petitioner] at least twice at the jail," spoke to Petitioner "on the phone numerous times," and met Petitioner "numerous times in court." (ECF No. 66-1 at 17, 26.) Petitioner testified at the post-conviction evidentiary hearing that he "[n]ever got to see [his trial counsel] very much, except for when [they] came to the courthouse." (*Id.* at 39, 41.) Petitioner also testified that he spoke with his trial counsel on the telephone "once, maybe twice," but that his other telephone calls went unanswered. (*Id.* at 57.) When asked what further investigation he wanted his trial counsel to perform, Petitioner responded: "I asked him if . . . they could do some kind of a - - not a DNA test or something like that on my

9

granddaugther . . . or find out if she was telling the truth or otherwise. I said I'd even take a lie detector test." (*Id.* at 46.)

The Nevada Supreme Court reasonably concluded that Petitioner failed to demonstrate a deficiency. Defense counsel has a duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments." *Strickland*, 466 U.S. at 688. Contrary to Petitioner's assertions, Petitioner's trial counsel appears to have met this burden. Petitioner's trial counsel testified that he "visited [Petitioner] at least twice at the jail," spoke to Petitioner "on the phone numerous times," and met Petitioner "numerous times in court." (ECF No. 66-1 at 17, 26.) The state district court found Petitioner's trial counsel to be credible. (ECF No. 16-14 at 4) (determining that Petitioner's "claim that counsel failed to devote sufficient attention to the case . . . was repelled by the credible testimony of [Petitioner's] trial counsel.") This Court will not supersede that credibility ruling. *See Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). Accordingly, it cannot be concluded that Petitioner's trial counsel's communication with Petitioner was deficient. *Strickland*, 466 U.S. at 688.

The Nevada Supreme Court also reasonably determined that Petitioner failed to demonstrate prejudice. Besides the alleged impeachment information discussed in Ground 1(a), Petitioner fails to explain what further information he was unable to convey or what further defense strategies would have been discussed if he and his trial counsel had further communications. Indeed, at the post-conviction evidentiary hearing, Petitioner only mentioned a DNA test, which would not have been helpful as the victim did not report the inappropriate touching until months after it happened, or a lie detector test, which would be inadmissible at trial, as other avenues to prove his innocence. (*See* ECF No. 66-1 at 46.) Thus, Petitioner fails to demonstrate that the result of his trial would have been different had his trial counsel communicated with him further. *Strickland*, 466 U.S. at 694; *see also Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not

established by mere speculation.").

The Court denies Petitioner relief with respect to Ground 1(b).

## C. Ground 1(f) and Ground 8

In Ground 8, Petitioner alleges that his federal constitutional rights were violated because his sentence of life in prison coupled with the imposition of lifetime supervision violates the Double Jeopardy Clause. (ECF No. 5 at 29.) Connectedly, in Ground 1(f), Petitioner alleges that his appellate counsel provided ineffective assistance by failing to raise this double jeopardy claim in his direct appeal. (*Id.* at 3.) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that the imposition of a sentence of life in prison, coupled with the imposition of a sentence of lifetime supervision, violated the Double Jeopardy Clause. Appellant raised this claim below only in the context of ineffective assistance of appellate counsel for failing to raise the double-jeopardy argument on direct appeal. He does not make any argument in this court about the ineffective assistance of appellate counsel in regard to this claim and thus fails to explain how the district court erred in denying the claim. *See id.* Further, as a separate and independent ground to deny relief, we conclude that appellant failed to demonstrate that appellate counsel was ineffective. The lifetime-supervision statute evinces a legislative intent to impose cumulative punishments for a single offense, *see* NRS 176.0931(1), (2), and double jeopardy is not implicated where the state legislature "has clearly authorized multiple punishments for the same offense," *Jackson v. State*, 128 Nev. ___, ___, 291 P.3d 1274, 1278 (2012), *cert. denied*, 134 S. Ct. 56 (2013). Thus, appellant did not show that this issue would have had a reasonable probability of success on appeal.

(ECF No. 17-6 at 5–6.) This ruling by the Nevada Supreme Court was not objectively unreasonable.

The Fifth Amendment's Double Jeopardy Clause prohibits multiple punishments for the same offense. U.S. Const. amend. V. The Double Jeopardy Clause provides three related protections: (1) it prohibits a second prosecution for the same offense after acquittal; (2) it prohibits a second prosecution for the same offense after conviction; and (3) it prohibits multiple punishments for the same offense. *United States v. Wilson*, 420 U.S. 332, 343 (1975). "[T]he final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." *Ohio v. Johnson*, 467 U.S. 493, 499

11

(1984). And "[b]ecause the substantive power to prescribe crimes and determine punishments is vested with the legislature, . . . the question under the Double Jeopardy Clause whether punishments are multiple is essentially one of legislative intent." *Id.* (internal quotation marks omitted). Thus, "if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." *Id.* at n.8.

Nev. Rev. Stat. § 201.230(2) provides that "a person who commits lewdness with a child . . . shall be punished by imprisonment in the state prison for life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years has been served." And Nev. Rev. Stat. § 176.0931(1) provides that "[i]f a defendant is convicted of a sexual offense, the court shall include in sentencing, in addition to any other penalties provided by law, a special sentence of lifetime supervision." A "[s]exual offense" includes a violation of Nev. Rev. Stat. § 201.230. *See* Nev. Rev. Stat. § 176.0931(5)(c).

Because Nev. Rev. Stat. § 176.0931(1) expressly provides that lifetime supervision is required "in addition to any other penalties provided by law," the Nevada Supreme Court reasonably concluded that the Nevada Legislature intended to impose multiple punishments—imprisonment followed by the possibility of parole and lifetime supervision—for a conviction of lewdness with a child. Due to this explicit intent by the Nevada Legislature, this Court's inquiry into the matter ceases. *See Johnson*, 467 U.S. at 499 n.8. The Court denies Petitioner relief with respect to Ground 8.

Turning to Petitioner's ineffective assistance of appellate counsel argument—Ground 1(f)—the *Strickland* standard discussed previously is also utilized to review appellate counsel's actions. A petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Because the Nevada Supreme Court's finding that double jeopardy was not implicated was reasonable, its finding that Petitioner's appellate counsel was not ineffective for failing to raise this claim on direct appeal was also reasonable. *See Strickland*, 466 U.S. at 688; *see also*

12

*Smith*, 528 U.S. at 285; *Jones v. Barnes*, 463 U.S. 745, 754 (1983) (internal quotation marks omitted) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every colorable claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. Nothing in the Constitution . . . requires such a standard.").

The Court denies Petitioner relief with respect to Ground 1(f).

## D.    Ground 2

In Ground 2, Petitioner alleges that his federal constitutional rights were violated because there was insufficient evidence to support his conviction. (ECF No. 5 at 9.) Specifically, Petitioner contends that there was insufficient evidence demonstrating that he possessed the requisite intent because he touched the victim with the backside of his hand and gave a corrective statement to her, which raises an inference of doubt that the touching "was for the intent of fulfilling some unfounded scope of lust or passion through [his] fingernails and rough nuckles [sic]." (*Id.* at 9–10.)

In Petitioner's state appeal of his judgment of conviction, the Nevada Supreme Court held:

> Smith argues that there was insufficient evidence to prove the element of intent. Smith contends that the evidence presented to the jury was insufficient to prove that he touched the victim with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child. In particular, Smith contends that the evidence presented at trial was that he was "curious," rather than seeking sexual gratification from touching the victim.
>
> This court will not overturn a verdict on appeal if it is supported by sufficient evidence. [Footnote 1: *Buff v. State*, 114 Nev. 1237, 1242, 970 P.2d 564, 567 (1998).] "There is sufficient evidence if the evidence, viewed in the light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." [Footnote 2: *Leonard v. State*, 114 Nev. 1196, 1209-10, 969 P.2d 288, 297 (1998).] Additionally, "'it is for the jury to determine what weight and credibility to give various testimony.'" [Footnote 3: *Buchanan v. State*, 119 Nev. 201, 217, 69 P.3d 694, 705 (2003) (quoting *Hutchins v. State*, 110 Nev. 103, 107, 867 P.2d 1136, 1139 (1994)).] Further, "[i]ntent need not be proved by direct evidence but can be inferred from conduct and circumstantial evidence." [Footnote 4: *Grant v. State*, 117 Nev. 427, 435, 24 P.3d 761, 766 (2001) (citing *Mathis v. State*, 82 Nev. 402, 406, 419 P.2d 775, 777 (1966)).]

Our review of the record on appeal reveals sufficient evidence to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. In particular, the victim testified to Smith's actions leading up to the touching and the actual touching and that Smith asked her not to tell anyone. Additionally, Smith admitted to the touching in the interview with Detective Eric Stroshine. Although Smith argues that being "curious" does not confer the necessary intent for a conviction, it is for the jury to determine the inferences that may be made from the evidence. We conclude that a rational jury could infer the requisite intent from the evidence adduced at trial.

(ECF No. 15-1 at 2–3.) This ruling was reasonable.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." *See id.* Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

The victim, T.H., who was eight years old at the time of the trial, testified that the Petitioner was her step grandfather. (ECF No. 13-17 at 21, 23–24.) In July 2006, Petitioner invited T.H. to spend two nights at his residence while Petitioner's wife, T.H.'s grandmother, was in California. (*Id.* at 26-27, 37.) Petitioner took T.H. to a water park twice during her stay, bought her a new bathing suit, and took her to play two games of miniature golf. (*Id.* at 36–37.) On the second evening, Petitioner and T.H. were sitting on a couch watching a movie when Petitioner "put his hands in [T.H.'s] pants" underneath her underwear. (*Id.* at 30, 37.) T.H. testified that she could feel Petitioner's fingers touch her private parts and that Petitioner rubbed her private parts for a few minutes. (*Id.* at 31.) Following the touching, Petitioner asked T.H. if she would tell anyone. (*Id.* at 32.) T.H. later

told her grandmother about the touching. (*Id.* at 33.)

Martha Smith, Petitioner's wife, testified that Petitioner proposed a camping trip in June 2006 for him and T.H., but Martha decided to go because she felt uncomfortable about Petitioner taking T.H. camping alone. (*Id.* at 47–49.) A month later, in July 2006, Martha went to California for two weeks, and unbeknownst to her, Petitioner invited T.H. to stay at their residence. (*Id.* at 50.) Martha testified that Petitioner "didn't do a whole lot with the grandkids," so she thought "that there was something fishy going on" when she learned that Petitioner took T.H. to the water park twice, bought her a bathing suit, and took her to the movies. (*Id.* at 51–52.) On November 26, 2006, T.H. told Martha that she had "'a secret about Grandpa,' and then she whispered in [Martha's] ear that he played with her privates." (*Id.* at 53.) Martha told T.H.'s mother about the touching later that day. (*Id.* at 55.)

Angela Thompson, T.H.'s mother, testified that after Martha told her what T.H. had said, she spoke to T.H. about the situation as well. (*Id.* at 60, 63.) T.H. told Thompson "some things and then [they] decided to call the police." (*Id.* at 63.) Thompson visited Petitioner after his arrest and "he had told [her] that he was very sorry. He was just very apologetic. He told [her] that what had happened was that [T.H.] was jumping on him and hit his privates, so he hit her privates and told her to - - that's where it hurts." (*Id.* at 65.) Petitioner also told Thompson that "telling [T.H.] not to tell" was "the worst mistake he made." (*Id.* at 65.)

Petitioner testified that he was lonely while his wife was out of town, so he invited T.H. over for the weekend in July 2006. (*Id.* at 93, 95.) T.H. asked to go to the water park, so he took her the first day of her visit. (*Id.* at 95.) T.H. asked to visit the water park again the next day, and Petitioner agreed after going to Wal-Mart to get some water shoes for himself and a new "two-piece" swimsuit for T.H. (*Id.* at 96, 100.) On the second evening, T.H. wanted to watch a movie, so Petitioner told her to change into her pajamas while he prepared the movie. (*Id.* at 96–97.) As T.H. was coming back into the living room, "she came in and jumped right on [Petitioner's] lap." (*Id.* at 97.) Petitioner then "raised [his] hand

15

over and [he] said, '[T.H.], right here is where you landed on Grandpa. That hurts.' And [he] did it twice. And she said, 'Stop.'" (*Id.*) Petitioner clarified that he "tapped [T.H.] twice [in the groin area] to make her realize that is where she jumped on." (*Id.*) Petitioner explained that his intent in touching T.H. was "[t]o show her that you shouldn't be jumping on" people. (*Id.* at 99.) Petitioner asked T.H. not to tell anyone what happened because he "thought people might get the wrong idea." (*Id.* at 98.)

During cross-examination, Petitioner testified that he did not remember telling the detective that he touched T.H. because he was curious. (*Id.* at 102; *see also id.* at 87 (testimony of Detective Eric Stroshine that Petitioner never mentioned during his police interview that he poked T.H. in a disciplinary fashion to show T.H. how it hurts to be jumped on).) Petitioner responded "maybe. I don't really remember" when asked if he "told the detective that [he] know[s] that it was wrong to touch her in the vagina, that [he] thought to himself, this is a no-no." (*Id.* at 103.) Petitioner, however, did recall telling the detective "that if [he] could tell [T.H.] something, that [he] would say - - tell [T.H.], 'I'm sorry, it won't happen again.'" (*Id.*)

The jury found Petitioner guilty of lewdness with a child under the age of fourteen years. (ECF No. 13–19.) At the time of Petitioner's trial, Nev. Rev. Stat. § 201.230 provided:

> A person who willfully and lewdly commits any lewd or lascivious act, other than acts constituting the crime of sexual assault, upon or with the body . . . of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of that child, is guilty of lewdness with a child.

The Nevada Supreme Court's ruling that there was sufficient evidence to convict Petitioner of lewdness with a child under the age of fourteen was reasonable.

T.H., who was under the age of 14, testified that Petitioner placed his hands under her underwear and rubbed her private parts for a few minutes. (ECF No. 13-17 at 30–31.) Regarding his intent, Petitioner testified that he was disciplining T.H. when he "tapped" T.H. in the groin area. (*Id.* at 97.) Contrarily, it appears that Petitioner told the police that he touched T.H. because he was merely curious. (*See id.* at 87, 102.) However, this Court

16

"must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved . . . conflicts in favor of the prosecution." *Jackson*, 443 U.S. at 326. And the evidence presented by the State demonstrated that Petitioner initiated a camping trip alone with T.H., that Petitioner invited T.H. over while his wife was gone, that it was unusual for Petitioner to spend time or money on his other grandchildren, that Petitioner asked T.H. if she was going to tell anyone about the touching, that Petitioner told T.H.'s mother that "telling [T.H.] not to tell" was "the worst mistake he made." (ECF No. 13-17 at 32, 47–52, 65.) Based on this circumstantial evidence along with Petitioner's conduct, a rational trier of fact could have found, beyond a reasonable doubt, that Petitioner had "the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of" himself or T.H. Nev. Rev. Stat. § 201.230; *see also Grant v. State*, 24 P.3d 761, 766 (2001) ("Intent need not be proved by direct evidence but can be inferred from conduct and circumstantial evidence."). Accordingly, as the Nevada Supreme Court reasonably concluded, there was sufficient evidence presented at trial to demonstrate that Petitioner committed the crime of lewdness with a child under the age of fourteen years. *See In re Winship*, 397 U.S. at 364.

The Court denies Petitioner relief with respect to Ground 2.

### E.    Ground 4

In Ground 4, Petitioner alleges that his federal constitutional rights were violated because the instruction regarding reasonable doubt reduced the State's burden of proof. (ECF No. 5 at 15.) In Petitioner's appeal of his judgment of conviction, the Nevada Supreme held:

> Smith contends that the statutorily mandated reasonable doubt instruction given in this case is unconstitutional. [Footnote 7: *See* NRS 175.211.] In particular, Smith argues that the instruction improperly quantifies reasonable doubt by forcing the jurors to undertake an improper risk taking analysis. This court has repeatedly upheld the statutory reasonable doubt instruction against similar constitutional challenges. [Footnote 8: *See, e.g.*, *Chambers v. State*, 113 Nev. 974, 982-83, 944 P.2d 805, 810 (1997); *Milton v. State*, 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995).] Accordingly, we decline Smith's invitation to revisit this issue.

(ECF No. 15-1 at 5.) This ruling by the Nevada Supreme Court was reasonable.

Issues relating to jury instructions are not cognizable in federal habeas corpus

unless they violate due process. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (explaining that the question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned'" (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973))). Petitioner's argument focuses on the fact that his due process rights were violated because the reasonable doubt jury instruction relieved the State of its burden of proof. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). The jury instruction at issue—Jury Instruction No. 18—provided:

> A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable, must be actual, not mere possibility or speculation.

(ECF No. 13-18 at 19.) This instruction mirrors Nev. Rev. Stat. § 175.211(1), which is the required reasonable doubt jury instruction language in Nevada.

The Nevada Supreme Court reasonably concluded that this jury instruction was constitutional. Indeed, this reasonable doubt jury instruction was merely identical[3] to the reasonable doubt jury instruction analyzed in *Ramirez v. Hatcher*, 136 F.3d 1209, 1210–

---

[3]The only difference between the reasonable doubt jury instruction provided in Petitioner's trial and the reasonable doubt jury instruction provided in *Ramirez* was the omission of the word "substantial." *Compare* ECF No. 13-18 at 19 ("[D]oubt to be reasonable, must be actual, not mere possibility or speculation."), *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210–11 (9th Cir. 1998) ("[D]oubt to be reasonable must be actual *and substantial*, not mere possibility or speculation.") (emphasis added). However, because "the use of the term 'substantial' to describe reasonable doubt has been disfavored," *Ramirez*, 136 F.3d at 1212, the reasonable doubt jury instruction provided in Petitioner's trial was even more acceptable than the reasonable doubt jury instruction in *Ramirez*.

11 (9th Cir. 1998). And in *Ramirez*, the jury instruction was found to not "unconstitutionally misstate the concept of reasonable doubt." *Id.* at 1214. Accordingly, because the jury instruction was proper, the Court denies Petitioner relief with respect to Ground 4.

## F.    Ground 5

In Ground 5, Petitioner alleges that his federal constitutional rights were violated when the State committed prosecutorial misconduct during its closing argument by diluting the reasonable doubt standard. (ECF No. 5 at 19.) In Petitioner's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Smith argues that the prosecutor's closing argument diluted the reasonable doubt standard. In particular, Smith challenges the prosecutor's statement that "[r]easonable doubt is one that answers the totality of the evidence." Smith concedes that no objection to the statement was made at trial, but argues that misstating the reasonable doubt standard should be reviewed for plain error. We conclude that Smith has failed to demonstrate that the prosecutor's comments affected his substantial rights or prejudiced him in any way amounting to reversible error. [Footnote 9: *See Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003) (stating that when conducting a review for plain error, "the burden is on the defendant to show actual prejudice or a miscarriage of justice").] When the challenged statement is viewed in context, the prosecutor simply argued that the jury should consider all of the evidence in determining whether reasonable doubt as to Smith's guilt existed. We further note that the jury was instructed that the statements, arguments, and opinions of counsel were not to be considered as evidence and that the jury was properly instructed on the reasonable doubt standard. Therefore, we deny relief on this claim.

(ECF No. 15-1 at 5–6.) This ruling by the Nevada Supreme Court was reasonable.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A court must judge the remarks "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413

19

F.3d 1101, 1115 (9th Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

During its closing argument, the State made the following comments:

Now, in this case, we talked about the standard of proof. It's beyond a reasonable doubt. It's not a magical formula. Ladies and gentlemen, this is the same standard that applies to every criminal case that's tried in America every case. Same standard: Beyond a reasonable doubt.

You know, it's based on common sense. Does your common sense tell you about the evidence in this case? And imagined doubt is not enough to acquit. You know, it's not something that somebody just speculates and makes up. Reasonable doubt is one that answers the totality of the evidence, and it must be actual, not a mere possibility, not a mere speculation.

(ECF No. 13-17 at 131–32.) Later, during its surrebuttal, the State commented:

This case is proved beyond a reasonable doubt - - that other instruction, Instruction 18, you know, doubt, to be reasonable, must be actual, can't be mere possibility or speculation - - does anybody actually doubt that what he described to Detective Stroshine happened? Do you doubt it? You know, this isn't something based on this evidence that's hard to decide. If you feel an abiding conviction of the truth of this charge, there's no reasonable doubt.

(*Id.* at 141.)

The Nevada Supreme Court's conclusion that the State's comment that "[r]easonable doubt is one that answers the totality of the evidence" did not amount to reversible error was reasonable. Indeed, judging this comment "in the context in which [it] was made," *Boyde*, 494 U.S. at 385, it appears that the State was merely commenting that all the evidence must be considered and compared. Accordingly, it cannot be determined that the State's comments infected Petitioner's trial with unfairness. *Darden*, 477 U.S. at 181; *cf. United States v. Williams*, 690 F.3d 70 (2d Cir. 2012) (determining that the prosecutor's comment that "'this is not a search for reasonable doubt. This is a search for truth'", was improper but not plain error).

Moreover, as the Nevada Supreme Court reasonably noted, the jury was instructed that arguments of counsel were not evidence. (ECF No. 13-18 at 4) ("Statements,

arguments and opinions of counsel are not evidence in the case.") Therefore, it cannot be concluded that this isolated comment—even if it amounted to misconduct—constituted a due process violation. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt). Furthermore, jurors are presumed to follow the instructions that they are given. *United States v. Olano*, 507 U.S. 725, 740 (1993). Here, as the Nevada Supreme Court reasonably noted, the jury was properly instructed on reasonable doubt. *See* Ground 4 *supra* Section IV.C.

The Court denies Petitioner relief with respect to Ground 5.

**G.     Ground 9**

In Ground 9, Petitioner alleges that his federal constitutional rights were violated because his lifetime supervision sentence under Nev. Rev. Stat. § 176.0931 infringed upon his right to travel, right to privacy, and other civil rights. (ECF No. 5 at 31.) Petitioner elaborates that the lifetime supervision statute allows his address and other information to be made public, which subjects him to uninvited hostilities and obstructs his employment opportunities. (*Id.*) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> Appellant also argues that the lifetime-supervision statute, NRS 176.0931, is unconstitutional because (1) it enhances a defendant's sentence without a jury-finding on the facts supporting the enhancement, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (2) it infringes on appellant's constitutional right to travel. . . . Second, his claim that the lifetime-supervision conditions infringe on his right to travel would not have been ripe for review on direct appeal, as he is serving a life sentence for his crime and the specific conditions of lifetime supervision will not be imposed until he is released from parole. *See Palmer*, 118 Nev. at 827, 59 P.3d at 1194-95.

(ECF No. 17-6 at 6.)

Nev. Rev. Stat. § 176.0931(1) provides that "[i]f a defendant is convicted of a sexual offense, the court shall include in sentencing, in addition to any other penalties provided by law, a special sentence of lifetime supervision." This "special sentence of lifetime supervision commences after . . . any term of imprisonment and any period of release on

parole." Nev. Rev. Stat. § 176.0931(2). Because Petitioner has not been released from parole—indeed, Petitioner was just recently granted parole—he is not currently subject to lifetime supervision. Therefore, the Nevada Supreme Court reasonably concluded that Petitioner's claim was unripe. *See Urban v. Nevada*, No. 3:11-cv-00427-HDM-VPC, 2012 WL 1142654, at *8 (D. Nev. April 4, 2012) (noting that because the petitioner's "conditions of his lifetime supervision have not been imposed[,] [t]he constitutionality of the lifetime supervision conditions therefore is not ripe for review").[4]

The Court denies Petitioner relief with respect to Ground 9.[5]

## V. CERTIFICATE OF APPEALABILITY

This is a final order adverse to Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Therefore, the Court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–865 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983)). Applying this standard, the Court finds that a

---

[4]Petitioner also alleges that Nev. Rev. Stat. § 213.1245(1)(p) and Nev. Rev. Stat. § 213.1258, which impose limitations on a parolee's access to the internet and other electronic means of communication, are unconstitutional. (ECF No. 5 at 31.) This claim lacks merit. *See Ebeling v. Smith*, No. 3:10-cv-00356-RCJ-WGC, 2012 WL 1716351, at *15 (D. Nev. May 11, 2012) (noting that "this court knows of no United States Supreme Court holding that finds" that Nev. Rev. Stat. § 213.1245 and Nev. Rev. Stat. § 213.1258 violate a petitioner's federal constitutional rights).

[5]Petitioner requested that this Court conduct an evidentiary hearing. (ECF No. 5 at 1.) Petitioner fails to explain what evidence would be presented at an evidentiary hearing, especially given the fact that a thorough evidentiary hearing was held at the state district court on his state habeas petition. Additionally, this Court has already determined that Petitioner is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying Petitioner's remaining grounds for relief. Accordingly, the Court denies Petitioner's request for an evidentiary hearing.

certificate of appealability is unwarranted.

## VI.    CONCLUSION

It is therefore ordered that Petitioner Larry Smith's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 by a person in state custody (ECF No. 5) is denied.

It is further ordered that Petitioner is denied a certificate of appealability.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 28th day of January 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE